## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **JOSEPH GOLDSTEIN** | : | |
| | : | |
| **Plaintiff,** | : | |
| **V.** | : | **Complaint** |
| | : | |
| | : | |
| **CAPITAL ONE BANK (USA), N.A.** | : | **Case No._____** |
| | : | |
| | : | |
| **Defendant.** | : | **Jury Trial Demanded** |
| | : | |
| | : | |
| | : | |

---

## *COMPLAINT*

Plaintiff Joseph Goldstein ("Goldstein"), pro se, respectfully submits this complaint against

defendant Capital One Bank (USA) N.A. ("Capital One" or the "Bank"), and alleges as follows:

## *PRELIMINARY STATEMENT*

1. This action seeks redress for the illegal and unfair practices of Capital One Bank, in

   particular, its failure to provide Plaintiff with "clear" and "conspicuous" terms of its

   contract, its failure to provide notice to Plaintiff of significant changes to the terms of the

   credit card contract agreement; its failure to comply with the Federal Reserve Board's

   Replenishment Suggestions, resulting in violations of the Truth in Lending Act ("TILA")

   15 U.S.C. § 1601 et seq. <u>12 C.F.R. § 226.56(j)(2)</u> and Regulation Z; and for its usurious

   interest charge in violation of 12 U.S.C. § 85, and 12 C.F.R. § 7.4001(a).

1

2.   As alleged in greater detail below, Capital One Bank ("Capital One" or "Bank"), failed to provide Plaintiff with "clear" and "conspicuous" disclosures in the manner mandated by the statutory provisions of TILA and by the corresponding federal regulations governing disclosures furnished in connection with new credit card account applications.

3.   More specifically, the Bank failed to provide "clear and conspicuous" terms with respect to its payments and replenishment scheme and it failed to give Plaintiff advanced notice of its willy nilly and outrageously extended long-term hold on payments in contradiction to its agreement and a 'significant change in the terms of the agreement'.

4.   Capital One deliberately declined to replenish Plaintiff's accounts despite its telephonic verification of clearance by Plaintiff's financial institution, resulting in an overlimit fee on another credit card Plaintiff was forced to use in the emergent circumstances. Capital One's decline to return the funds resulted in a  sudden change in both the minimum payment and the correct interest rate, both of which, are significant changes in the terms of the agreement requiring a 45-day notice; furthermore its flat out refusal to make the funds available or to return the funds as pleaded by Plaintiff to its various representatives, resulted in a usurious interest payment in direct violation of 12 U.S.C. § 85, and 12 C.F.R. § 7.4001(a).

5.   TILA's purpose is to assure meaningful disclosure of credit terms in order to (i) allow consumers to compare more readily the various credit terms available; (ii) enable consumers to avoid the uninformed use of credit; and (iii) protect consumers against

inaccurate and unfair billing practices. 15 U.S.C. § 1601(a). The Bank's conduct violates the express provisions of the TILA and the applicable Regulations.

### *Jurisdiction and Venue*

1. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337, as well as under 15 U.S.C. § 1640(e), because this action arises under TILA, 15 U.S.C. § 1601 et seq. and 12 U.S.C. § 85, 12 C.F.R. § 7.4001(a).

2. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000 and the parties are citizens of different states.

3. Venue is proper in this district because the Bank transacts business in this district and the interests of justice require maintenance of this action in this district.

### *Parties*

4. Plaintiff Joseph Goldstein is a resident of New York State, which is within this district. Plaintiff is a "consumer," as that term is defined by $ 1602(f) of TILA, because this complaint arises from the Bank's offer and extension of credit to Plaintiff, a credit card holder, for personal, family or household purposes.

5. Upon information and belief, Defendant Capital One Bank is doing business in the State of New York and throughout the United States, with a principal place of business in McLean Virginia.

6. The Bank is a "creditor," as that term is defined by section 1602(f) of TILA and Regulation Z ("Regulation Z"), 12 C.F.R. section 1026.2(a)(17) and 12 C.F.R. section 1026.2(a)(17), because at all relevant times, the Bank, in the ordinary course of its

business, regularly - i.e., more than 25 times à year - extended or offered to extend consumer credit for which a finance charge is or may be imposed, which is payable in more than four installments.

### *Factual Allegations*

7.  Plaintiff is the holder of both, a Capital One Platinum Master Card account (Account ending in 6214) and a Quicksilver Mastercard (Account ending in 2108), which were issued by the Bank on separate occasions in 2021 and are generally intended for the purchase of goods or services or the procurement of cash advances.

**<u>The Platinum Card</u>**

8.  Upon information and belief, on or about May 7th, 2021, Plaintiff received an email from the Bank inviting Plaintiff to pre-qualify for a Platinum card, together with a summary table of disclosures.

9.  Upon information and belief, on or about May 7th, 2021, Plaintiff completed the Bank's credit card application on its website https://www.capitalone.com.

10. Upon information and belief, on May 14th, 2021, the Bank advised Plaintiff via e-mail that his application had been approved and that he would be receiving his Platinum card within 10 days in the mail.

11. Upon information and belief on May 23d, 2021, Plaintiff received his Capital One Platinum card from Capital One.

12. Upon information and belief, on May 27th, 2021, Plaintiff made his first purchase with the Platinum card.

13. Upon information and belief, on July 6th, 2021, Plaintiff made his first payment in the amount of $55.00. (Please see statements Exhibit).

**The Quicksilver Card**

14. Upon information and belief, on or about July 23d, 2021, Plaintiff applied for a Quicksilver Mastercard from Capital One through its website https://www.capitalone.com.

15. This application was approved instantly on the Banks website and Plaintiff received his Quicksilver Card in the mail on or about August 3d, 2021.

16. Subsequently, Plaintiff made multiple payments, per billing cycle on each of his cards; via the application or "app" and always from his bank account at Wells Fargo. In October of 2021, Plaintiff made approximately 6 payments between the two cards. All in all, he made approximately 25 payments between the periods of May of 2021—November 2021 on his two cards. *(Please See attachment Exhibit A)*.

17. All payments were made through the Capital One's App and through his bank account at Wells Fargo Bank, and always well before the due date; as the agreement suggested that: "**We may make services available that allow you to make *faster* or *recurring payments online or by telephone*. We will describe the terms for using these services and any applicable Fee before you use them. You do not have to use these other payment services.**" **(Please see exhibit Agreement)**.

18. Indeed, the payments made through the app were "Faster" and were either available instantly or within one business day thereof.

**The November 14th, 2021, Payment**

19. On Sunday November 14, 2021, Plaintiff had a rental vehicle that he had rented on the 10th of November 2021 and said vehicle broke down on Saturday night, miles from Plaintiff's home, and he desperately needed funds.

20. Based on his previous **25** experiences and upon existing common knowledge and belief that payments made via the Capital One Mobile App will be either instantly *credited* and *posted* to Plaintiff's account and available for use, or, worst case scenario, the payment will be credited to his account instantly and made available for use within the next business day, caused him to transfer approximately $236.20 of his money from Wells Fargo Bank to Capital One Bank, to be credited and posted to his Quicksilver card.

21. On early Sunday morning, the 14th of November,2021; Plaintiff, completed a payment in the amount of $236.20 on the app.

22. Upon completion of the payment Plaintiff discovered that the 'system' didn't make his payment available instantly as he had experienced on 25 previous occasions.

23. Plaintiff immediately telephoned Capital One's customer service.

24. After a 35-minute wait he was connected to a representative. This representative placed Plaintiff on an additional lengthy hold and subsequently transferred him to a series of "specialists".

25. After speaking to the final 'specialist' and explaining his dire predicament of his vehicle being broke down and that the rental agency didn't have a replacement vehicle due to this being  a holiday weekend and a 'chip shortage' story, and that his only option was to tow the vehicle to a local mechanic that would be open on Tuesday morning; the 'specialist' suggested that Plaintiff Three-Way his bank to verify the funds were in his account, and if so, she would try to get the $236.20 payment released.

26. Plaintiff made the three-way call, and upon hearing the available balance through Wells Fargo Bank's automated system, the 'specialist', stated "I have verified the funds and I

will now connect you to another specialist in the authorization department who will help get the funds released to allow use of the card immediately.

27. After approximately 1.45 hours on the telephone with representatives and specialists from various departments, Plaintiff was told: "Unfortunately, we won't be able to release your payment today, you will have to wait for the 'system to post it on Tuesday, the first business day that the bank is open".

28. *On Tuesday, November 16th, 2021, when Plaintiff checked his app and discovered that Capital One didn't replenish his account on the first business day, as he had been informed and promised by the numerous representatives and specialists, he promptly contacted Capital One again and demanded that they either make the funds available immediately or to return the money to Wells Fargo Bank as Plaintiff needed the money urgently to repair his rental vehicle and get back on the road.*

29.  Capital One however, has callously, willfully, unlawfully, and outrageously ignored Plaintiff's request and instead sought to convert and capitalize on this payment and placed the funds on hold for *TWENTY-SIX DAYS!*

30. Plaintiff, at this point was shocked and irate by the callous, grossly unreasonably, and unwarranted actions of the Bank.

31. Being desperate and not believing the 26-DAY-HOLD was for real, he asked the representative if, perhaps, he was to make a payment on his other card, the Platinum Mastercard if he'd fare any better.

32. The representative stated that" as long as the card is current, meaning it isn't "overlimit" and his payments were on time and that no payment is returned, she doesn't see why a hold would follow."

33. In fact, the representative informed Plaintiff that it is most likely that **the payment will be processed in accordance with Capital One's Policy. i.e., if a payment is received on a business day before 8:00 P.M. it is credited that day and available the next business day.** *(Please see Exhibit B attached* Capital One Credit Card Payment Posting (wallethub.com).)

34. Based on the assurance of the representative and Wallet Hub's confirmation/information that if he was to make a payment before 8:00 P.M. on Tuesday the 16th of November 2021, he would have it available by Wednesday after 8:00 A.M. and feeling desperate and stressed under threat from a "mechanics lien", Plaintiff reluctantly made a payment on the app for $170.00, as the mechanic promised to begin repairs if he can at least obtain a $150.00 deposit/authorization on a credit card.

35. The same result ensued. No credit was available from the payment despite the representatives promise of "normal processing."

36. Plaintiff followed the circus acts one more time and went through the process of a lengthy hold, representative, specialist, and finally supervisor. With the same result and company line. "Unfortunately we won't be able to release your funds until December 16th, 2021 !!!

37. On November 20th, 2021, Plaintiff received an email notifying him that the payment to his Quicksilver card has posted, and indeed the December 2021 statement falsely reflects that Plaintiff had available credit of $300.00 from November 22nd, 2021. *(Please See Exhibit C attached)*

38. Based on this email, Plaintiff, checked on the app to see if the payment had indeed cleared. However, upon checking the app, Plaintiff saw the funds are still not available,

but thought that perhaps the representative realized the error of the bank and had made it right, he contacted Capital One, yet again.

39. *After some breathing exercises and other relaxation techniques, he summoned up the courage of going through the lengthy process again: representative, specialist, another specialist, and finally a supervisor, all in the span of an hour, Capital One ultimately refused to either return the funds to Plaintiff's Wells Fargo Account, or to make it available for use on both cards, and instead converted $600.00 for its own use.*

40. Plaintiff's failure at communication with this set of representatives left him Frustrated, desperate, and angry, Plaintiff, tried once again to contact the Banks representatives and hoped to plead with a compassionate human being to release the funds.

41. To no avail. He was mocked and laughed at! Once again with the company line, "unfortunately the funds are on hold for "TWENTY-SIX DAYS!

42. These s actions are not just unconscionable, illogical, unreasonable, and illegal; they threaten the integrity of the functions and trust in the credit card payment and replenishment system.

43. Plaintiff's transfer was intended to pass through as a payment for, a Platinum credit card ending in 6214, and a for a Quicksilver card ending in 0564 at the time (a new card was subsequently mailed with a new number ending in 2108) which Plaintiff is a consumer with rights to these funds.

44. Without justification, Capital One in its "false flag" custom and under false pretext has taken the baseless position that Plaintiff's payment(s)—***was to be placed on a twenty-six-day hold***.

45. Capital One has refused to return Plaintiff's money despite crystal-clear evidence that

the payments were made in belief that they will become available instantly.

46. Plaintiff advised Capital One upon making the payment that it was, in fact, an emergency, and that he needed the funds to be either returned or made available on the cards instantly.

### The Better Business Bureau Complaint

47. Plaintiff seeing that the Bank decided to violate the law and to continue with its outrageous conduct designed to punish him for whatever willy nilly reason, filed a complaint with the Better Business Bureau. (Case: 16166215)

48. In response to the complaint (*Please see Exhibit D attached*) Capital One not only developed amnesia with respect to the numerous and lengthy calls between Plaintiff and its representatives; they flat out denied having such a conversation with Plaintiff. Despite Plaintiff's numerous calls begging, pleading for them to either make his funds available on the card for use or to return the funds to his Wells Fargo Bank account. The Bank further offered a grossly unreasonable, false, and misleading explanation for its unlawful retention of Plaintiff's money. In its response to the complaint, they wrote the following outrageous letter:

49. Dear Joseph Goldstein, We're reaching out to you about the concern you submitted to the Better Business Bureau (BBB). We understand you're concerned about a hold on the payment of $236.20 made on November 14, 2021. We also understand you'd like your available credit to be increased by the amount of the above payment. We'd like to share some additional information about this. Sometimes a hold is placed on a payment while the bank processes the payment. The length of time a payment will be held may vary based on a number of different factors.
Here are a few things you can do to help reduce the likelihood of having a hold placed on your payments:
 • Continue to make payments on time
 • Avoid having payments returned
 • Ensure payments aren't higher than your credit limit
 • Use the same bank account for payments when possible
 • Send payments using Western Union or MoneyGram

• Pay through your bank's website.
 If you have concerns about our ability to delay the availability of credit until we confirm payments have cleared, please refer to your Customer Agreement (enclosed), under the section called "Payment Processing". **After thoroughly researching your call history from November 14, 2021; November 18, 2021; and November 20, 2021, we were unable to locate any calls where you were provided the information you stated in your submission. In this instance, we are respectfully declining your request for compensation of interest charges.**

50. Capital One *created New Conditions under which it may hold a payment*—none of those are listed in the agreement that it cites as support for this unconscionable and outrageous act. The Bank wrongfully, unconscionably, and outrageously engaged in an attempt to mislead the "BBB"  and the" CFPB" with false flag appearance, suggesting through implication, that, perhaps, the reason it placed such a lengthy hold and refused the return of funds is; if one has no prior knowledge of Plaintiff's account, and who reads this letter, would conclude that Plaintiff had either made a late payment, had a payment returned, and or that his card was overlimit. All are bold faced lies. They know and knew it to be false when they wrote it.

51. In fact, given the contents of this letter, in particular, the list of conditions under which payments *may be* delayed, is missing entirely from the contract and supports the Plaintiff's Complaint that he complied with all these mandates and normally his funds were made available if not instantly, within one business day.

52. Capital One has no claim to Plaintiff's money. It was not expecting a full payment for the cards. Rather, they were due a "minimum payment of $25.00.

53. It should have known that the 'full' payments were made in hopes of replenishing Plaintiffs cards to pay for emergent circumstances, as he has done on 25 previous occasions; or he would never have made substantial payments while dealing with the

significant financial consequences caused by the ongoing pandemic and his desperate need to get back to his ailing father in the city.

54. See Federal Reserve Study on Credit Limit Impact on a consumer's spending, in order to spend, he needs to consider the ability to borrow as part of a portfolio of assets that households use to smooth consumption. *The value of this asset depends on whether it will be available when needed…. credit is wealth in the short term since it can help smooth consumption. An increase in the chance of losing credit makes this wealth less valuable while a decrease in the credit limit reduces this wealth directly.*

55. The legal system needs to treat these actions as what they obviously are—deliberate—unconscionable actions and opportunities for unscrupulous actors to seize on desperation.

### THE FIRST CAUSE OF ACTION

**Violations of Truth in Lending Act, 15 U.S.C. §§ 1601, *et seq.*, Regulation Z, 12 C.F.R. §§ 1026.1, *et seq.* – "Clear and Conspicuous" Requirement**

56.  Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

57. TILA expressly provides that, "Information required by this subchapter shall be disclosed clearly and conspicuously, in accordance with Regulations of the Bureau." 15 U.S.C. § 1632(a).  Regulation Z, in turn, provides that, "The creditor shall make the disclosures required by this subpart clearly and conspicuously." 12 C.F.R. § 1026.5(a)(1)(i).

58. Interpreting TILA, the Bureau provides in Subpart B of Regulation Z that Defendant must make certain "Account-opening Disclosures" in a "clear and conspicuous"manner,

including but not limited to "*The type of transaction* to which [an interest] rate applies, if different rates apply to different types of transactions." 12 C.F.R. § 1026.6(b)(4)(i)(C).

59. A credit card disclosure required by TILA, and Regulation Z is not "clear and conspicuous" within the meaning of TILA and Regulation Z if such disclosure is ambiguous from the perspective of a reasonable consumer. *See, e.g., Rubio v. Capital One Bank*, 613 F.3d 1195, 1202 (9th Cir. 2010) ("[I]t is precisely because reasonable consumers can interpret an ambiguous disclosure in more than one way that such a disclosure cannot be clear and conspicuous."); *Watts v. Key Dodge Sales, Inc.*, 707 F.2d 815, 817 (5th Cir. 1983) ("At the very least, the provision is ambiguous, thus violating the TILA or Regulation Z."); *In re Whitley*, 772 F.2d 815, 817 (11th Cir. 1985) ("[T]hese divergent readings of the provision render the language ambiguous and therefore violative of TILA and Regulation.").

**The Language of the Agreement Confuses the Reasonable Consumer and its clauses are contradictory, Ambiguous, and Inconspicuous and Misleads a Reasonable Consumer as to the Bank's True Payment Processing Practices**

60. First, the Bank states on page 4 of the agreement in relevant part*: (Please see Exhibit D attached)*

### Other Payment Services
We may make services available that allow you to make
***faster or recurring payments online or by telephone***. We
will describe the terms for using these services and any
applicable Fee before you use them. You do not have to
use these other payment services

**The Definition of Faster is:** happening quickly: taking a short amount of time a *fast* race We're off to a *fast* start. Or, **characterized** by quick motion, operation, or effect:
**(1):** moving or able to move rapidly: SWIFT a *fast* horse
**(2):** taking a comparatively short time a *fast* race

61. Thus, the first part of "Other Payment Services" suggests to a reasonable consumer that by utilizing either the Bank's App or its Website, or its Telephone System, will result in ***Faster*** processing which in turn means ***faster*** availability for use.

62. Certainly, Faster is Not Synonymous with a 26-day hold.

**63. <u>The Second Part of the Language in the Agreement further Confuses the Reasonable Consumer and shows its contradiction to the previous section and its fresh Ambiguity, Confusion and Misleads the Reasonable Consumer as to the Bank's True Payment Processing Practices</u>**

The second part of the payment processing of the agreement states in relevant part:

…. **Payment Processing**
We may accept and process payments without losing
any of our rights. ***We may delay the availability of
credit until we confirm that your payment has cleared.***
See exhibit page 4. Of the agreement.

<u>**The Definition of Delay is defined as:**</u>

the act of postponing, hindering, or causing something to occur more slowly than normal: the state of being <u>delayed</u> get started without *delay*

**b:** an instance of being delayed apologized for the *delay* a rain *delay*

**2:** the time during which something is delayed waited out a *delay* of 30 minutes

**The word delay is squarely contradictory to the previous section of making payments faster.**

64. By disclosing that "[w]e may delay the availability of credit until we confirm that your payment has cleared. This is effectively "unclear", "ambiguous", and "affirmatively

contradictory and misleading", as to the length of time it takes to 'confirm the payment has cleared'.

65. Is it a year, a month, a day, ten years. It is super unclear a) when a delay may happen, and b) if a delay is going to happen, for how long, as such disclosure would leave the reasonable consumer unclear and misled as to the length of time it takes to confirm payment has cleared his/her bank. In fact, reasonable consumers expect their payments to be credited and posted to their accounts within 2 business days at the most. Ergo, Capital One's required disclosures were ambiguous (at best) and grossly misleading, not "clear and conspicuous" under TILA and Regulation Z.

66. Moreover, the conditions the Bank cites in its letter to the "BBB", they suddenly developed **New** concepts and rules when a "hold may be placed". Nowhere in the contract does it state anything about a hold being placed on funds other than for a determination that the payment has cleared, nor, does it state how to avoid a hold under the conditions they created and not listed in "clear" and "conspicuous" language as it mentioned in the letter.

67. Had Capital One provided "clear and conspicuous" terms with respect to its payment processing and clearance, Plaintiff would have never made the payments and he would in all likelihood have avoided an overlimit fee on another debit card and a rise in his hypertension as a result of becoming irritated and aggravated by Defendant's callous actions.

### THE SECOND CASUE OF ACTION
**Violation of Truth in Lending Act, 15 U.S.C. §§ 1601, *et seq.*,
Regulation Z,12 C.F.R. §§ 1026.1, *et seq.* – "Significant Change in
Account Terms"**

68.  Plaintiff hereby repeats and re-alleges each and every allegation set forth above as if

fully set forth herein.

69.    The Truth in Lending Act, at 15 U.S.C. § 1637(i)(2), requires credit card issuers to "provide a written notice of any significant change, as determined by rule of the [U.S. Consumer Financial Protection] Bureau, in the terms . . . of the cardholder agreement between the creditor and obligor, not later than 45 days prior to effective date of the change."

70.    Pursuant to its express authority under 15 U.S.C. § 1637(i)(2), the Consumer Financial Protection Bureau ("Bureau") promulgated 12 C.F.R. § 1026.9(c)(2) which provides the following "Rules affecting open-end (not home-secured) plans," *i.e.*, credit card plans:

(i)    Changes where written advance notice is required.

(A)  General. For plans other than home equity plans . . ., when a significant change in account terms as described in paragraph (c)(2)(ii) of this section is made, a creditor must provide a written notice of the change at least 45 days prior to the effective date of the change to each consumer who may be affected.

12 C.F.R. § 1026.9(c)(2)(i) (emphasis added). Section 1026.9(c)(2)(ii) then defines

"Significant changes in account terms" as follows:

**For purposes of this section, a "significant change in account terms" means a change to a term required to be disclosed under § 1026.6(b)(1) and (b)(2), an increase in the required minimum periodic payment, a change to a term required to be disclosed under § 1026.6(b)(4), or the acquisition of a security interest.**

## Capital One Changed the Minimum Payment Amount Overnight

71. By providing Plaintiff with monthly statements which list the due dates as 17th of the month and the 9th of the month respectively for the different cards and it further lists the minimum payment as $25.00, (Please see Statements Exhibit), Plaintiff's multiple

payments equaled $600.00 far greater than the $25.00 minimum payment that the Defendant was expecting; its refusal to return $550.00 of Plaintiff's funds to his Wells Fargo account, or to make it available immediately for use and instead converted the payments for its own use; it effectively changed the minimum payment from $25.00 on each card to $300.00 overnight. Capital One made "significant changes" to Plaintiffs' credit card terms within the meaning of 15 U.S.C. § 1637(i)(2) and Regulation Z promulgated thereunder.

**Capital One Changed the Terms of the Interest Rate Overnight**

72. Capital One further changed the terms of the agreement with respect to the current interest rate. At a minimum payment of $25.00 the interest rate is 0% See agreement's introductory rate. However with a payments of $300.00 to each card for a total of $600.00, the interest rate is a whopping 169.23076923077% , on $300.00. For $600.00 the Interest Change is: 184% !

73. Upon making these significant changes overnight to Plaintiffs' credit card terms in November 2021, Capital One did not provide advance written notice of the change as required by 15 U.S.C. § 1637(i)(2) and Regulation Z.

74. In the alternative, Regulation Z provides as follows:

> [I]f a creditor increases any component of a charge, or introduces a new charge, required to be disclosed under § 1026.6(b)(3) that is *not* a significant change in account terms as described in paragraph (c)(2)(ii) of this section, a creditor must either, at its option:

a. Comply with the [45-day notice] requirements of paragraph (c)(2)(i) of this section; or

b. Provide notice of the amount of the charge *before the consumer agrees to or becomes obligated to pay the charge*, at a time and in a manner that a consumer would be likely to notice the disclosure of the charge. The notice may be provided orally or in writing.

12 C.F.R. § 1026.9(c)(2)(iii).

75. The credit card terms specifically enumerated in 12 C.F.R. § 1026.6(b)(3) include,but are not limited to, the following:

> For charges imposed as part of an open-end (not home secured) [credit card]plan, *the circumstances under which the charge may be imposed*, [and] theamount of the charge or an explanation of how the charge is determined.

> 12 C.F.R. § 1026.6(b)(3)(i).

76. Had Capital One provided Plaintiff with advance notice of these changes as required by TILA and Regulation Z, then Plaintiff would not have made full payments to his credit cards to be used in an emergency and would not have incurred Capital One' surprise New Minimum Payments and New Usurious Interest Rates and the overlimit fees and interest charges he incurred on his other Non-Capital One debit card.

### THE THIRD CAUSE OF ACTION
**Violation of Truth in Lending Act, 15 U.S.C. §§ 1601, *et seq.*,
Regulation Z,12 C.F.R. §§ 1026.1, *et seq*. <u>12 C.F.R. § 226.56(j)(2)</u>**

62. Plaintiff hereby repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

a) The Staff Commentary sates in relevant part:

b) 56(j)(2) Failure To Promptly Replenish Section 226.10 of Regulation Z generally requires creditors to credit consumer payments as of the date of receipt, except when a delay in crediting does not result in a finance or other charge.

c) This provision does not address, however, when a creditor must replenish the consumer's credit limit after receiving payment. Thus, a consumer may submit payment

sufficient to reduce his or her account balance below the credit limit and make additional purchases during the next cycle on the assumption that the credit line will be replenished once the payment is credited. If the creditor does not promptly replenish the credit line, the additional transactions may cause the consumer to exceed the credit limit and incur fees. In the September 2009 Regulation Z Proposal, the Board proposed to prohibit creditors from assessing an over-the-limit fee or charge that is caused by the creditor's failure to promptly replenish the consumer's available credit. Section 226.56(j)(2) of the final rule adopts the prohibition substantively as proposed. Public Comments Consumer groups supported the proposed prohibition against assessing over-the-limit fees or charges caused by a creditor's failure to promptly replenish the consumer's available credit**.**

d) **Industry commenters generally did not oppose the proposed prohibition but asked the Board to provide additional guidance regarding what it considered to be ''prompt'' replenishment of the consumer's available credit. One industry commenter asked the Board to specifically permit a creditor to wait a reasonable amount of time after receiving payment before replenishing the consumer's available credit. This commenter noted that while creditors will typically credit payments as of the date of receipt, the rule should not expose creditors to possible fraud or nonpayment by requiring them to make credit available in connection with a payment that has not cleared. In response to the Board's request for comment regarding whether the rule should provide a safe harbor specifying the number of days following the crediting of a consumer's payment by which a creditor must replenish a consumer's available credit, industry commenters**

**offered suggestions ranging from three to ten days in order to provide creditors sufficient time to mitigate any losses due to fraud or returned payments**. One industry commenter cautioned that establishing any parameters regarding replenishment could contribute to a higher cost of credit if the established time period did not permit sufficient time for payments to clear.

e) **Legal Analysis**

**In most cases, card issuers replenish the available credit on a credit card account shortly after the payment has been credited to the account to enable the cardholder to make new transactions on the account.** As a result, a consumer that has used all or most of the available credit during one billing cycle would again be able to make transactions using the credit card account once the consumer has made payments on the account balance and the available credit is restored to the account. If, however, the card issuer delays replenishment on the account after crediting the payment to the consumer's account, the consumer could inadvertently exceed the credit limit if the consumer uses the credit card account for new transactions and such transactions are authorized by the card issuer. In such event, the consumer could incur substantial monetary injury due to the fees assessed and potential interest rate increases in connection with the card issuer's payment of over-the-limit transactions. Because the consumer will generally be unaware when the card issuer has delayed replenishing the available credit on the account after crediting the payment to the account, the Board concludes that consumers cannot reasonably avoid the injury caused by over-the-limit fees and rate increases triggered by transactions that exceed the limit as a result of the delay in replenishment.

63. In short, even under the most extreme case, a creditor should not exceed the 10-day period of verification of clearance of payment.

64. Capital One's blatant violation of this recommendation resulted in Plaintiff incurring an over limit fee on another card, a rise in his blood pressure, and extreme emotional distress.

***THE FOURTH CAUSE OF ACTION***

**Violation of the National Bank Act. 12 U.S.C. §§ 85, 86 and 12 C.F.R. § 7.4001(a). Usurious Interest Rates**

65. Plaintiff hereby repeat and re-allege each and every allegation set forth above as if fully set forth herein.

66. The term "interest" as used in 12 U.S.C. 85 includes any payment compensating a creditor or prospective creditor for an extension of credit, making available of a line of credit, or any default or breach by a borrower of a condition upon which credit was extended.

67. Capital One is a National Bank and as such is governed by the Act and its interpretations through the Office of The Comptroller of the Currency.

68. It is clear that Capital One's refusal to return Plaintiff's funds resulted in Defendant charging a usurious interest rate.

69. The math is simple. The minimum payment due was $25.00, actual amount received was $236.20, resulting in a percentage difference of a whopping 161.715% ! clearly usurious under federal and state laws.

### THE FIFTH CAUSE OF ACTION
### BREACH OF CONTRACT AND IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

70. Plaintiff hereby repeat and re-allege each and every allegation set forth above as if fully set forth herein.

71. Plaintiff entered into adhesive, Written Contracts with Defendant Capital One Bank USA, N.A.

72. The Written Contracts provide that, "This agreement and your account will be governed by federal law, as well as the law of Virginia and will apply no matter where you live or use this account." *See, e.g.,* Ex.

73. Under Virginia law, Defendant, and its agents acting on its behalf, breached the Written Contracts between Capital One Bank by deliberately and maliciously delaying the availability and replenishment of Plaintiff's credit cards, which did not and does not constitute "Faster" "Services" under the Written Contracts.

74. In every contract there is a duty of good faith and fair dealing imposed on the parties.

75. Where an agreement permits one party to unilaterally determine the extent of the other's required performance, an obligation of good faith in making such a determination is implied. According to the agreement between Capital One and its customers it unilaterally chooses whether to make available for use funds that it received via its various processing options.

76. Capital One breached this obligation and acted and continued to act in bad faith b intentionally failing to timely and reasonably credit and post plaintiff's payments thereby denying him the benefit of its contractual obligation to supply a credit limit of $300.00 in exchange for payments.

77. Capital One further breached the agreement by its failure to provide 'clear and conspicuous terms' and by its failure to provide 'advanced notice to significant changes' it made overnight to the agreement.

78. As a direct and proximate result of Defendant's breaches of its Written Contracts with Plaintiff, and the implied covenant of good faith and fair dealing, Plaintiffs has sustained financial losses, costs, damages and expenses in amounts to be proven at the trial of this matter.

### THE SIXTH CAUSE OF ACTION
### VIOLATION OF NEW YORK' DECEPTIVE PRACTICES ACT
### GENERAL BUSINESS LAW §349

79.  Plaintiff hereby repeat and re-allege each and every allegation set forth above as if fully set forth herein.

80. Section 349 of New York's General Business Law makes deceptive acts and practices related to consumer maters illegal.

81. The actions complained of herein relate to consumer matters between the Plaintiff and Defendant.

82. Capital One failed to timely and reasonably disclose material facts concerning the amount of time it takes for electronic payments to post and become available for use.

In its agreement with Plaintiff it lists the following:
**Other Payment Services**
We may make services available that allow you to make faster or recurring payments online or by telephone. We will describe the terms for using these services and any applicable Fee before you use them. You do not have to use these other payment services…. **Payment Processing** We may accept and process payments without losing any of our rights. We may delay the availability of credit until we confirm that your payment has cleared. See exhibit page 4. Of the agreement.

83. Reading all this in conjunction the "Other Payment Services, which says the Bank "[m]ay make services available that allow you to make *faster and recurring payments online and by telephone*…then it says: "We may delay the availability of credit until we confirm that your payment has cleared….and finally it states: "We may withdraw the funds from your deposit account as early as the same day we receive your payment." Id. Is clearly ambiguous and contradictory.

84. Given the adjective *Faster* and the fact that the Bank may withdraw the funds on the same day the *faster payment* is received, makes any delay in the availability patently

illegal, illogical and absurd. It further confuses the *faster* and *delay.* Which is it? Do they

allow for *Faster payments* to allow the customer *faster availability to his/her credit*, or

are they delaying it? If they are delaying it when they take the money out on the same

day, is that reasonable? And for a period of time, which is? According to the Federal

Reserve Staff at the extreme case of fraud prevention when someone has demonstrated

concern is 10 days, see the Legal Analysis of the Board in the section, not 26 days.

85. Moreover, Investopedia and Forbes both define a reasonable period of waiting for funds

to be available as 2-3 days, in light of The Expedited Funds Availability Act was enacted

in 1987 by the United States Congress for the purpose of standardizing hold periods on

deposits made to commercial banks and to regulate institutions' use of deposit holds.

86. Certainly a 26-day hold defies the law, reason, logic, fairness in this fast-paced modern

society. See "*Real Life" "preparing for the 7 most challenging days of your life*, McGraw

P. (2008), Free Press "The other downside to technology is has conditioned us to want

everything in seconds, and when that doesn't happen, we feel stressed. Admit it when

your computer takes minutes rather than seconds to download a file you get irritated, and

when your supermarkets express lane is slow, your heart rate quickens." Pg.46 The

Velocity of Life Section.

87. "[w]here one party has taken advantage of another's necessities and distress to obtain an

unfair advantage over him, and the latter, owing to his condition, has incumbered himself

with heavy liability or an onerous obligation for the sake of a small or inadequate present

gain, equity will relieve him."

88. Capital One deceived Plaintiff with its previous processing of his payments in the 'faster'

and same day availability' without resorting to placing a hold certainly not an illegally

extended hold without notification of such change in the terms of processing or that may delay the availability may be for a willy nilly timeframe.

89. As a result of this deceptive and unfair conduct Capital One exerts undue bargaining power over Plaintiff. The Bank further failed to notify the Plaintiff of this willy nilly hold of his funds during the emergent circumstances of Plaintiff constitutes fraud, unconscionable, commercial practices, false pretenses, false promises, and misrepresentations. Capital One's knowing concealment of the extended period of delaying the funds for use, and or its omission of said hold, and its contradictory clauses in the agreement is in violation of § 349 of New York's General Business Law, which makes such deceptive practices illegal.

### THE SEVENTH CAUSE OF ACTION
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

90. Plaintiff hereby repeat and re-allege each and every allegation set forth above as if fully set forth herein.

91. As mentioned throughout the complaint, Defendant Capital One and its agents engaged in extreme and outrageous conduct by misleading Plaintiff with respect when his funds will be available, the numerous calls with lengthy waiting times of regular representatives and specialists all which Capital One either deliberately deleted or suddenly in a continuous effort to cause pain to Plaintiff developed amnesia with respect to all the calls mentioned where Plaintiff begs, pleads, and asks for his funds to either be made available for use or to have it returned to Wells Fargo Bank.

92. These extreme and outrageous act and actions resulted in Plaintiffs Blood Pressure to rise to dangerous levels and hospitalization further causing pain and suffering of severe emotional distress.

## THE EIGHT CAUSE OF ACTION
## *Conversion*

93.  Plaintiff repeats, realleges, and incorporates by reference the foregoing allegations as though fully set forth in this paragraph.

94. Capital One has and is continuing to exercise unauthorized dominion over specifically identifiable assets of Plaintiff, namely the $600.00 that was transferred between November 14th-20th,2021.

95. Despite Plaintiff's demands that Capital One return the assets in question, Capital One has refused to do so.

## PRAYER FOR RELIEF

A declaration that the Bank's systematic and standard policy of furnishing application materials that make disclosures of account terms to customers in an ambiguous and confusing terms, and its failure to give notice after significant changes to the terms, and its absurdly lengthy hold of funds, and its refusal to return the funds constitutes violations of the Truth in Lending Act, Regulation Z, and in violation of the National Bank Act.

(1) An injunction permanently prohibiting the Bank from engaging in the conduct described.

(2) Maximum statutory damages as provided under 15 U.S.C. § 1640(a)(2);

(3) Actual damages and restitution resulting from the Bank's unlawful

failure to disclose;

(4) Litigation expenses, and costs; and

(5) An order to prohibit Capital One to retaliate in any fashion including but not limited

to the cancellation, suspension, and or reduction of credit as a result of this litigation, and

(6) Such other and further relief as to this Court may seem just and proper.

Respectfully Submitted,

Joseph Goldstein *Pro Se*
20 Zenta Road
Unit# 203
Monroe New York, 10950
sheiagoldstein@gmail.com

Dated: January 22, 2022